## CHADELOID CHEMICAL CO. v. F. W. THURSTON CO. et al.

(District Court, N. D. Illinois, E. D.    January 26, 1915.)

### No. 29423.

1. PATENTS ☞229—INFRINGEMENT—PATENT FOR PROCESS.

Infringement of a patent for a process of mixing substances is not avoided, because the order described is not followed, unless such order is essential to produce the product sought.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 366, 368; Dec. Dig. ☞229.]

2. PATENTS ☞328—VALIDITY AND INFRINGEMENT—PAINT AND VARNISH REMOVER.

The Ellis patent, No. 714,880, for a paint and varnish remover and process of making the same, held not anticipated nor invalid because of prior use. Claims 6, 7, and 8 for the product also held infringed.

In Equity. Suit by the Chadeloid Chemical Company against the F. W. Thurston Company, Frank W. Thurston, and John C. Thurston. On final hearing. Decree for complainant against defendant corporation.

Victor Elting, of Chicago, Ill., and Frederick S. Duncan, of New York, for complainant.

Taylor E. Brown and Clarence E. Mehlhope, both of Chicago, Ill., for defendants.

SANBORN, District Judge. Infringement suit on claims 1 to 8 of patent No. 714,880, issued to Charleton Ellis December 2, 1902, but dating from February, 1901, for improvements in paint and varnish removers, and the process of making them. The patent has been sustained by Judge Hazel in the Western District of New York (Chadeloid Chemical Co. v. Frank S. De Ronde Co. [C. C.] 146 Fed. 988), and in other districts, but is again attacked as void for anticipation by prior patents, for noninvention, and seven prior uses are set up in the answer. Testimony as to these was taken, and defendants' brief discusses all of them. The briefs submitted cover 593 pages. Defendants' brief of 368 pages has no index, but I have supplied one for convenience in examination of the many questions discussed. Eighteen defenses are

fully discussed by defendants' counsel, with ability, and the greatest care and thoroughness.

The following statement from complainant's brief shows the general features of the Ellis invention:

"The patent is for a chemical composition for the removal of old coats of paint and varnish preparatory to repainting and refinishing furniture, household and office trim, railroad cars, steamboats, yachts, etc. The remover is composed of two classes of liquid solvents: First, benzol or its homologues; and, second, grain or wood alcohol, or their equivalents—and of a waxy body, such as paraffin or ceresin wax. Both of the liquids are good solvents of paint and varnish, the benzol or similar hydrocarbons having an energetic penetrating action, while the alcohol is an efficient softener and loosener of the old finish. Both of these liquids are highly volatile—so volatile that, if applied alone, they would evaporate before having any appreciable effect on the paint and varnish. The use, however, by Ellis of a waxy body in the combination of the benzol and alcohol renders it highly effective as a practical paint and varnish remover. Benzol is a good solvent of wax, whereas alcohol is a very poor solvent of wax and precipitates it from solution in benzol. The result of the combination of these three ingredients is that the wax is partly in solution and partly precipitated throughout the remover in a cloudy condition. When such a remover is spread upon the wood from which the finish is to be taken, the wax quickly forms a film over the surface of the remover, effectively preventing the evaporation of the liquid solvents and keeping them wet and active in their solvent work for a long period of time. The formation of this waxy film has been likened to placing a watch crystal over the volatile liquids. It keeps them moist for hours when otherwith they would evaporate in a minute or two.

"The presence of the two classes of liquid solvents (benzol and its equivalents and alcohol and its equivalents) is necessary for two reasons: First, neither benzol and wax nor alcohol and wax would leave the wax in an effective film-forming evaporation-preventing condition. In the second place, the two solvents are needed effectively to loosen and to dissolve the paint and varnish; the combination of the two classes being far more effective and capable of wider use on all kinds of paint and varnish than either solvent alone.

"It is also necessary that the two classes of solvents should be miscible with each other. If they were immiscible they would exist in the remover in separate layers, neither of which would have the desired qualities of the three ingredients combined in the Ellis remover. The wax would be wholly dissolved in one layer and not precipitated by the other, and neither layer would effectively attack the paint or varnish. As has already been pointed out, neither one solvent alone nor the two solvents together would have any practical value without this waxy ingredient that prevents the evaporation of the liquids, and neither solvent alone with wax would be effective. The remover is spread over the painted or varnished surface and left for a few minutes or a couple of hours, according to the thickness and toughness of the finish to be removed. Evaporation is substantially prevented by the wax film, and the benzol penetrates and the alcohol loosens and softens the old finish so that it can easily be brushed or scraped off with a soft rag or a dull tool."

The first five claims are for the process of mixing the materials, and six, seven, and eight for the product. Some of these follow:

"(3) A process of thickening or gelatinizing a composition which softens dried paint or varnish by the precipitation of a dissolved wax by means of an aliphatic alcohol substantially as described."

"(6) A composition for removing paint and varnish consisting of a wax, a solvent for the wax, and an alcohol combined, substantially as described."

"(8) A composition for removing paint and varnish consisting of a wax dissolved in benzol or its immediate homologues and gelatinized by the addition of an alcohol, substantially as described."

Judge Hazel sustained the patent in 1906, in the Southern District of New York. This decision was followed by Judge Dodge in the First Circuit in 1907 on a motion for temporary injunction. In 1910 a like ruling was made by Judge Chatfield in the Eastern District of New York, and on final hearing in 1912 by Judge Veeder. Finally Judge Lacombe granted a temporary injunction in the Southern District of New York in 1913, and Judge Learned Hand has just sustained the patent on final hearing in the same case. Chadeloid Chemical Co. v. Wilson Remover Co. (D. C. S. D. N. Y.) 220 Fed. 681, January 6, 1915.

Defendants have attacked the binding effect of the De Ronde decision, on the theory that the later rulings are all virtually based upon it. The De Ronde record is in evidence for a particular purpose, in order to see just what was before the court in that case. Defendants' counsel state the grounds of attack as follows:

"It has been pleaded in the answer in this case that the proceedings in the De Ronde Case 'were collusive and not a precedent for this court to follow or notice.' Part of the basis for this charge is in the defendants' proofs and part in the record of the De Ronde Case. We are permitted to examine that record only to show what was or was not before Judge Hazel. In other words, the De Ronde record is merely presented as a reference and not as evidence herein. Almost immediately upon the entry of the decree in the De Ronde suit, the defendant therein negotiated for and obtained a free license under the Ellis patent in suit. No appeal was taken from that decision. Moreover, it is a fact that the complainant corporation promptly organized, with the aid of De Ronde himself, an association of paint and varnish manufacturers, all of whom were licensed under the Ellis patent in suit. Prompt advantage was taken of Judge Hazel's decision and of the decree in the De Ronde suit, so that no opportunity was afforded for a proper review of that decision and decree by the Circuit Court of Appeals of the Second Circuit.

"The fact that no appeal was taken, the fact that the licensees were gathered together so expeditiously, and that such arrangements were largely promoted by De Ronde and another officer of the De Ronde Company, created much comment and caused a suspicion to be entertained in the trade that the De Ronde defense was not bona fide, and that it was to the defendant's interest to have the Ellis patent sustained rather than defeated. That suspicion finds some justification in the record of the De Ronde suit, which, as before stated, we are at liberty to examine for that purpose. We find that at a crucial point in the examination of defendant's principal chemist and expert witness, Dr. McKenna, and after he had been interrogated with reference to the prior art removers, anticipating or approximating the exact and precise formula of the Ellis patent in suit, he was asked whether or not, in view of the prior art, it required invention for Mr. Ellis to bring together a mixture or prepare a mixture combining a hydrocarbon, such as benzol, an alcohol, and a wax or waxy body, such as paraffin, and he declined to answer.

"The prior art in the De Ronde Case showed that the combination of a solvent and an alcohol and fusel oil have the effect of retarding, to some extent, the evaporation of the other volatile elements. The question was asked Dr. McKenna whether or not in such event, and in view of other facts of the prior art, and the prior use of wax in this art, it would require invention to substitute the well-known paraffin wax for the fusel oil for the purpose of increasing the retarding of the evaporation of the volatile elements. Dr. McKenna, who was the defendant's chief witness, begged the question and stated that he could not answer, because 'the distinction is a delicate one which requires consideration,' for which he was not prepared. It is patent that defendant thereby, though quite unnecessarily, admitted the patentability, or rather the inventive ingenuity necessary to sustain letters-patent. The brief filed by counsel for complainant in the De Ronde Case cited and harped upon and made great use of this admission and this failure to cast doubt

upon the inventive act. Such admission would not have been made, except the defendant desired to gain thereby, and the record herein shows that he did gain in that De Ronde had his expenses repaid him by the association and gained a free license. However, we shall show, by reference to the opinion of Judge Hazel in the De Ronde suit, and by the evidence introduced in the case at bar, that under no possible exercise of the principle of comity (a rule no longer enforceable after the decision of the Supreme Court in Mast-Foos & Co. v. Stover, 177 U. S. 485 [20 Sup. Ct. 708, 44 L. Ed. 856]) is this court bound to follow the reasoning or the conclusions announced by Judge Hazel. Upon the contrary, we shall show by the evidence adduced by the case at bar that this court must of necessity come to a different conclusion."

Surely counsel cannot be serious in asserting that these matters afford even the slightest ground for collateral attack. The answer does not show wherein the suit was collusive; there is not a hint that Judge Hazel was deceived. It seems that Dr. McKenna was asked an incompetent question, and answered that the matter required consideration, and that after the decision the parties, and others interested, got together and compromised the suit. A more frivolous attack can hardly be conceived. In view of Judge Hand's decision, it is unnecessary to follow defendants' brief through its 18-page analysis of the De Ronde decision, by which it is sought to show that the case should not be followed because of Judge Hazel's mistakes of fact, and the new evidence in the case at bar.

[1] Is the process of the patent one contemplated by the statute? One of the process counts (4) claims:

"The process for producing a composition for removing paint and varnish by the dissolution of a wax or mixtures of waxes in benzol and the subsequent precipitation by an alcohol, substantially as set forth."

The position of defendants is that, if these five process claims are invalid, the product claims fall with them; also that, even though the remover used by defendants contains the same materials as that of the patent, there is no infringement, unless the process is the same, which is not shown by the evidence. They further claim that the words "substantially as set forth," occurring in four of the process claims, import the particulars of the specification into them, and confine the claims to that particular method; and that the patent requires that the wax must first be dissolved in the hydrocarbon solvent and then the alcohol be added thereto.

"A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new, or patentable, whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence." Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139.

In Corning v. Burden, 15 How. 252, 14 L. Ed. 683, the Supreme Court said that a new process is usually the result of a discovery, while a new machine is the result of invention, and then went on to state that:

"Where the effect or result is produced by chemical action, by the operation or application of some element or power of nature, or of one substance to another, such modes, methods, or operations are called processes."

It is no doubt true that, if a certain order of mixing materials is essential to the useful result to be secured by the process, that order must be followed, otherwise not. In some processes order is of little consequence, as in smelting, setting up an induced current in a motor or dynamo, or purifying a medicine. The coke and the ore need not be put into the furnace in any particular order. Either the field or the armature may be revolved. In aspirin the chloroform may be first put on the acetyl salicylic acid, or vice versa. In these cases there is no question of order, only of a new and useful way of getting results. The aspirin patent was for a product, not a process. Kuehmsted v. Farbenfabriken, 179 Fed. 701, 103 C. C. A. 243.

[2] The process and product of Ellis undoubtedly constitute a single invention, as in the Tucker Bronze Case (Plummer v. Sargent, 120 U. S. 442, 7 Sup. Ct. 640, 30 L. Ed. 737), where a patent for the process and another for the product were taken out. It was held that the product patent only covered articles made by the described process On the other hand, it would seem that, in a process for mixing substances, the order described in the specifications need only be followed, where it is essential to produce the particular product sought. Ellis does say that the wax is to be dissolved in a hydrocarbon oil, and *subsequently* precipitated by the addition of an alcoholic body miscible with the solvent, and only slightly dissolve the wax, and all the claims require either precipitation or subsequent precipitation (which is the same thing) of dissolved wax in alcohol. It appears from the testimony that there is an equivalent method of obtaining the same result, by mixing hot benzol and alcohol, adding finely divided wax, and stirring until cool. It is the process *substantially* as described, not literally, which is covered by the claims. The patent is a meritorious one, and should not be defeated on a purely technical objection. I think the process claims are valid, following the De Ronde and Wilson Cases and others referred to, unless there has been established a prior use by the evidence for the first time appearing here.

*The Cleveland and Chicago Wood-Finishing Prior Uses*: These cover a great part of the testimony and briefs, and are the chief attempts to show the Ellis patent invalid. It seems unnecessary to consider the other alleged uses, since the testimony to support them falls far short of the essential legal tests. The two now considered were not before Judge Hand in the Wilson Case, although the Chicago use was available. The reason for not relying on it may be more apparent further on.

The Ellis patent covers benzol or its equivalent, alcohol (or equivalent), and wax. The alleged Cleveland prior use is shown to have been benzol, fusel oil, wood alcohol, and paraffin wax dissolved in turpentine. It was used on the Rockefeller house in Cleveland in the fall of 1898, more than two years before the Ellis patent, and is called the Weber-Wright formula in the testimony. I find that the evidence is sufficient to establish an experimental use of this formula some time

220 F.—44

before February, 1901 (from which time the Ellis patent has its inception), but not in public use or on sale for more than two years before. So the supposed anticipation depends on the fact that the Weber-Wright formula was "known or used by others in this country" (R. S. § 4886 [Comp. St. 1913, § 9430]) before Ellis' discovery. Unless, therefore, such prior use was abandoned, or the presence of the fusel oil made it a different product, it seems an anticipation is shown.. If the use of this remover was abandoned because unsatisfactory by reason of its offensive smell or effect on the workman, or for any other reason, it was an abandoned experiment, and could not be a valid anticipation. It was used on the Rockefeller job, then on the Swetland job at first, but the work finished with lye. It is also claimed to have been used on the Masonic Temple job, but from charges in the Weber account book it would seem to appear that the work was done with acid, lye, and sandpaper. Mr. George S. Wright testifies positively that he did not use beeswax on any but the Rockefeller job, and between the time of that use and 1899 he did not make any mixture of paraffin, fusel oil, benzol, and alcohol. On the question being repeated to him, he says they might have left out the fusel oil and used only benzol and alcohol, but he cannot recall positively. It is obvious that this kind of testimony falls far short of the standard required to establish a prior use. It is true that the Weber-Wright formula appears in written form on December 30, 1899, and that Weber asserts that its use was not abandoned.

"Q. 136. And since the date of the Rockefeller job, what is the fact with respect to the use of the paint and varnish remover, referred to, whenever jobs presented themselves on which such a remover was desirable to be used? A. When occasion required since that time we have used the varnish remover, but not to the exclusion of other methods, where it seemed in our judgment more expedient to use other materials. If it became necessary to remove the varnish from the top of a table, or flat surface, it sometimes was removed with scrapers, afterward cleaning it up with wood alcohol. On exterior work, where we were working on old hard paint, we have found it much cheaper and more expeditious to use the torch. Where we had large surfaces to remove, we were not compelled to use great care to prevent material getting on the floors. We have used lye and afterward bleached the work with oxalic acid; the latter process being much cheaper and frequently more rapid than had we used the varnish remover.

"Q. 137. State whether or not, since the date of the Rockefeller job, you or your firm have abandoned the use of that same paint and varnish remover? A. We have not; on the contrary, we have used it continuously ever since that date."

These answers make no discrimination between the time before the Ellis patent date and the period since, and, being general in their character, are not of sufficient weight, unless fully corroborated. Counsel for defendants argue that a single prior use is sufficient to avoid the patent, but this claim must be taken with much allowance in view of the rule as to abandoned experimental uses. John A. Smith was employed by Weber part of 1898, all of 1899, and part of 1900, and does not remember the formula being used, except on the Rockefeller and Swetland jobs. M. E. Cox was likewise employed from 1897 to 1910, and says the remover was used on the Rockefeller, Austin, the boat City of Erie, and the Swetland, work. J. J. Rush worked for Weber

from 1898 to 1905, and he did not use a wax remover for a number of years after the Austin job, which was in 1900 or 1901. John A. Wright, brother of George S. Wright, used a sample can of the Weber-Wright remover. He does not mention any further use of it. Out of some 28 cases shown by the Weber shop book in which paint or varnish was taken off, only 7 show the use of the Weber-Wright remover, and some of these are not clear.

George S. Wright left the Weber shop December 30, 1899, and in 1903 worked for the Cleveland Varnish Company. In 1903 he obtained from Weber a sample of the "Adelite" remover, put out by the Adams & Elting Company, and made under the Ellis patent. It was called "Perfecto," and contained benzol, paraffin wax, bisulphide of carbon, amylacetate, acetone, and wood alcohol. Fusel oil was left out because of its stifling odor.

I have read the testimony of all the witnesses for defendants on the Weber-Wright formula, and, on the whole, I think the evidence shows that its use was experimental only, and was abandoned because of the long-continuing stifling odor of the fusel oil, possibly also because the benzol was not a pure product. Assuming that fusel oil is a form of alcohol (Judge Hand found it to be different), I still think the Cleveland prior use amounted only to an abandoned experiment.

*The Chicago Wood-Finishing Company's Prior Use.* It is unnecessary to consider the evidence relied on in support of this defense in detail, because of some very remarkable circumstances connected with it. It is claimed that a remover was discovered by the witness Matthes many years before Ellis' invention, composed of substantially the same ingredients, being benzol, methyl alcohol, and paraffin wax, and that it was made and sold by the Chicago Company from 1890 to a recent date. The two main witnesses for this prior use are Matthes, and the secretary of the Chicago Company, Mr. Hulin. Further it is claimed this anticipation is corroborated by certain papers and books of the same company.

As early as 1905 it was reported that the Chicago Company had a prior use defense which would defeat the Ellis patent, and from that time to 1913 the precise nature of this supposed anticipation remained a profound mystery, whereby its value was no doubt greatly enhanced. *All this time the evidence of priority was for sale.* In 1907 there was a conference between Hulin and representatives of the complainant, at which an offer to destroy the proofs was made. Later, and on May 2, 1907, Mr. Charles C. Linthicum had a conference with Mr. Duncan, attorney for complainant, Mr. Hulin and Mr. Hulin's attorney, and the following recital is taken from Linthicum's testimony:

The whole talk was about this prior use. Linthicum requested to see the documents, but was told by Hulin that he would not submit them to him or any one else, except on condition that the Chicago Company was given a release for the past, a license for the future, and a sum of money. "I was unable to understand the sum of money, and discussed it with Mr. Hulin and his attorney, trying to get at the foundation for the demand. I cannot, of course, give the conversation, but the substance of it was that this defense was supposed to be sufficient to break down the patent; that if an arrangement was made the defense would not be available to other infringers; that, if the arrangement was not made, the defense might or might not be made

available to other infringers, but that the Chicago Wood-Finishing Company proposed to conduct its business and rely upon this defense to maintain its position. I raised the ethical question as to whether proofs could be properly withheld and also the practical question, stating that I knew that other people had information that such a defense was claimed to exist. During the course of the conversation the amount of money demanded was mentioned. As I recollect it, it was $25,000. Either before or after this interview I discussed the ethics of the proposition with Mr. Duncan, also the probability or improbability of the defense being presented by other alleged infringers. There was no difference of opinion between Mr. Duncan and me on the proposition that no sum of money could or should be paid to the Chicago Wood-Finishing Company as a condition for suppressing this information or turning it over to Mr. Duncan, which was the method proposed. Whether Mr. Hulin or Mr. Parker stated that the books and data would be turned over to Mr. Duncan I cannot now state, but I got this information from some one at the time."

The next attempt to market these proofs was in 1911 and 1912, when a written proposal to sell the assets and good will of the Chicago Company to the Bridgeport Wood-Finishing Company of Connecticut was made. As a part of this offer the Chicago Company, by Hulin as its secretary and general manager, proposed to make a contract that there should be transferred to a person connected with the Bridgeport Company all processes, formulas, labels, and good will now or heretofore used by it as a going concern and relating to the making, using, and marketing of paint and varnish remover, and all evidence whatsoever relating to the manufacture, use, and sale of such removers prior to the year 1901, which is now in the possession of said company, but said company hereby reserves the right to use said evidence in its defense of the infringement cases now pending against it and its customers. These offers were not accepted.

Finally, and on June 5, 1912, the Chicago Company, by Hulin and Thomas R. Smith, vice president, gave to a person acting for the Wilson Remover Company, defendant in the suit decided by Judge Hand, an option to purchase its paint and varnish remover business, formulas, good will, etc., including evidence now held by said Chicago Wood-Finishing Company of its continuous use and sale of neutral removers of substantially the present formula continuously since a date several years prior to the year 1899, which remover consists essentially of alcohol, benzol, and wax in suspension therein, as covered by the Ellis patent, No. 714880, dated December 2, 1902. The option was carried out by written contract of December 7, 1912, by which the remover business and the following were sold for $15,000: All of the documentary evidence now held by the party of the first part of its use and sale of neutral and non-neutral removers of substantially the present formulas since a date several years prior to the year 1899, said evidence to be held in the custody of Parker & King for the mutual use and benefit of the parties hereto, the party of the first part reserving the right to use said evidence in the defense of the patent infringement litigation hereinafter enumerated; and otherwise the said documentary evidence shall be under the direction and control of the party of the second part and shall be delivered to the party of the second part by Parker & King, free from any claims of any kind of the party of the first part, upon the termination of all of said patent infringement litiga-

tion. The party of the second part shall have the right to examine said evidence from time to time and to take such copies of same or inventories of same as may suit its convenience.

Promissory notes were given for the contract price, and $5,000 paid. The purchaser later returned the documentary proofs and has refused to pay the other $10,000, being dissatisfied with his purchase. It is obvious that the Wilson Company did not put in the proofs of the Chicago use either because they were in its opinion insufficient, or because they feared the $15,000 purchase would be disclosed and they be accused of purchasing evidence, as well as consenting to its possible suppression. A later contract, of January 30, 1913, again emphasizes the latter feature, that no third person should be permitted to see these supposed proofs.

While Matthes does not appear in this series of offers and contracts, there is other evidence to show clearly his willingness to co-operate with Hulin.

The proofs having finally been returned to Hulin's attorney, the Chicago Company sold its business to the defendants in this case (without the proofs, which still belong to the agent of the Wilson company), and the evidence was put in as a defense.

The facts recited are so flagrant (to say the least) that no court would be justified in paying the slightest attention to this prior use evidence, since the testimony of Hulin and Matthes is vital.

*Infringement.* The manager of the Thurston Company testified that defendants had not practiced the methods or processes of the Ellis patent, "but have sold a paint or varnish remover which I believe is similar to that described in the Ellis patent." This witness refused to answer whether defendants' remover contained benzol, wood alcohol, an alcoholic body, paraffin wax, any wax soluble in benzol and relatively insoluble in alcohol. He also refused to state how their product was made. Although these questions were perfectly proper ones, the witness took it upon himself, without advice by the attorney for defendants, to decline to answer.

Much is made by the defense of the fact that carbolic acid removers are much better than the Ellis product, and that the Wilson Remover Company's product belongs to that class. If defendants desire to return to the carbolic acid removers of the prior art, they are at perfect liberty to do so, at their peril of infringing the Ellis patent by putting in an amount not greater than that which was held to infringe by Judge Hand.

Defendants' remover is the same as that of the patent, except that it contains 26 per centum of acetone, which is a volatile liquid solvent of paint and varnish, and acts much like wood alcohol. It is made from the same sources. In the patent product it is an equivalent for alcohol. The product claims are infringed.

As to the process claims, there is no express evidence of the way in which defendants produce their product, while their manager, by a sort of negative pregnant, testifies they do not use the exact process described in the first five claims. This might suggest that they use something like it. Infringement, however, must be clearly shown, and the record is silent as to just how defendants make their remover.

It may be that in the 1,800 printed pages of evidence there is something showing that the individual defendants should be held personally liable for infringement. If so I have not found it.

There should be a decree against the corporation defendant declaring infringement of claims 6, 7, and 8, and for an injunction, accounting, and costs.