## KAUMAGRAPH CO. v. SUPERIOR TRADE-MARK MFG. CO., Inc., et al.
### No. 6384.

District Court, E. D. New York.
Feb. 2, 1933.

Mock & Blum (by Asher Blum), of New York City, for plaintiff.

Victor D. Borst, of New York City, for defendants.

CAMPBELL, District Judge.

This action is based on the alleged infringement by the defendants of patent No. 1,718,966, issued by the United States Pat-ent Office to Winthrop Stanley Lawrence, assignor to Kaumagraph Company, a corporation of New York (the plaintiff), for improvement in marking compositions, dated July 2, 1929, on application filed January 11, 1926.

The corporate defendant is charged with making and using the transfers which are alleged to have infringed the aforesaid patent, and the individual defendants, who own the capital stock of the corporate defendant and are officers thereof, are charged with liability as the owners of all the corporate stock, and are alleged to have exceeded their duties as such officers.

The defendants have by answer interposed the defenses of invalidity and noninfringement, and the individual defendants have denied personal liability.

Plaintiff's title is unquestioned, and notice was given before the commencement of this suit.

The objects of the alleged invention of the patent in suit are generally stated by the patentee in the specification thereof, as follows:

"One of the objects of my invention is to provide an improved transfer ink composition which is solid at ordinary temperatures so that it can be applied in the molten condition to a paper base to make a transfer having a marking of any desired type, the said ink being releasable from the transfer under the action of heat and pressure to duplicate the said marking on a suitable piece of fabric.

"Another object of my invention is to devise a transfer ink and a transfer of this type in which the marking shall be readily soluble in water so that it shall be removed from the garment or fabric upon the first washing thereof."

This suit is based upon claims 1, 2, 3, 4, 6, 7, and 8 of the patent in suit.

Claim 1 reads as follows: "1. A solid fusible base for a marking composition including a mixture of rosin soap and shellac soap."

The composition of claim 2 includes: "A mixture of a resin acid soap and the soap of a fatty acid, the said base being decomposable by water."

The composition of claim 3 includes: "The soap of a fatty acid, a rosin soap, a shellac soap, free rosin, free shellac, and free caustic soda."

The composition of claim 4 includes: "A resin acid soap and an additional ingredient

which is more soluble in water than said resin soap, the said base being decomposable by water."

Claims 6, 7, and 8 relate to the method of making the ink base.

The method of claim 6 consists: "In treating a mixture of a soap of a fatty acid and a resin with glycerine and an alkali."

The method of claim 7 consists: "In saponifying a resin in a mixture of water and glycerine having dissolved therein a fatty acid soap and then evaporating the water."

The method of claim 8 consists: "In saponifying rosin and shellac in a mixture of water and glycerine containing a dissolved soap of a fatty acid, then substantially evaporating the water, and then adding to the composition a substance which is more soluble in water than a resin soap."

Each of the product claims as well as each of the method claims contains the limitation of a rosin soap, a resin acid soap, rosin or resin.

Rosin and shellac are both resins.

The patentee in the specification of the patent in suit says: "I believe that I am the first to form a transfer ink by combining a resin acid with an alkali and soluble bodies so as to form a fusible composition which is solid at ordinary temperatures, melts without any substantial decomposition, and which is also readily soluble and can be easily dissolved or decomposed by water, and that my invention is pioneer in this respect."

As before stated, the limitation of a resin acid runs through all of the claims in suit and limits them, and the broadest possible interpretation that can be placed upon the invention of the patent in suit limits it to a composition containing a specific definite ingredient, a resin acid.

■ The patentee was in error in his contention that he was a pioneer, and this is clearly shown by the references cited in the file wrapper and contents of the patent in suit, which were offered in evidence on the trial of this suit, to wit: Patent No. 1,070,713, to Meckbach, August 19, 1913, for Decalcomania material; and patent No. 1,515,123 to Kruse, November 11, 1924, for ink. And by the action of the Patent Office on the original claim 1 of the patent in suit, which reads as follows: "A solid fusible base for a marking composition including a resin acid soap, the said base being decomposable by water." And which was rejected as not defining patentable subject-matter because "it is claiming

nothing more than a well known substance i. e. resin acid soap."

The claim was thereafter rewritten, as follows, and given the number 12: "A solid fusible marking ink comprising a base composed substantially of fusible ingredients including a resin acid soap, the said base being intermixed with a marking ingredient and being decomposable by water." And was rejected on patent to Meckbach, No. 1,070,713, in the following form: "Claim 12 is rejected on Meckbach, of record. This reference discloses a resin acid soap as a binder, and if a resin acid soap would be decomposable by water in applicant's case it would have to act similarly under like conditions in the case of the reference. An old product is not patentable by merely assigning to it a new adaptability." The patentee acquiesced in the rejection of claim 12 as aforesaid, and canceled the claim.

The original claim 6 of the patent in suit was a much narrower claim, and after amendment read as follows: "A solid fusible base for a marking composition including a resin soap and glycerine, said base being composed substantially of fusible ingredients."

This amended claim was rejected on Kruse, No. 1,515,123, November 11, 1924.

The patentee also acquiesced in the rejection of claim 6, amended as aforesaid, and canceled the claim.

This was likewise shown by the patent to Pignone, No. 918,903, April 20, 1909, and by autographic inks, which were well known before any date of invention that may be claimed for the patent in suit.

There was no demand for a water soluble transfer prior to the invention of the patentee. While it is true that the mills were having trouble from spotting, in their attempts to remove markings, their search was for solvents to remove the markings, when required.

The trade at that time desired their markings to remain on the goods that were sold, and the Gotham Silk Hosiery Company for whom the witness Jacobson was the factory superintendent, about November, 1930, was induced to experiment with them, and continued such experimentation until about May, 1932, when they went into use by that company on a large scale.

Plaintiff first offered the transfers to its customers for experimental purposes four or five years ago, made no sales before March, 1929, and only a few sales during 1929, and brought the transfers out in advertising and

general promotional work, in its efforts to sell them, in about January, 1930.

Many of plaintiff's customers who use transfers and to whom it sells numerous other compositions, have no use for soluble transfers, the use of which is generally confined to the hosiery trade, and of those who would have use for soluble transfers in a general way, the sale of them is approximately 50 per cent.

Construed most liberally, the patent in suit is not a primary invention but a secondary or improvement patent, and not entitled to the wide range of equivalents contended for by the plaintiff, but only a range wide enough to protect the invention of the patent in suit.

We are not in this suit concerned with the product or method of the Textile Transfer & Seal Company, which in another suit brought by the same plaintiff, in the United States District Court for the Southern District of New York, was alleged to infringe because the product and method of the defendant, alleged in this action to infringe, is not the product and method of the said Textile Transfer & Seal Company.

The corporate defendant's process and product, alleged in this suit to infringe, are not the result of any information obtained by either of the individual defendants or their former associates, Mr. Hipp and Mr. Bayliss, while in the employ of the plaintiff, but were solely the work of the defendant Lohmann, based on the knowledge and experience gained by him in his work with autographic and lithographic inks long before he entered the employ of the plaintiff, and as he is not a chemist, it would seem that all he required was the knowledge of an ordinary ink maker.

[2] The procedure followed and the ingredients used by the defendant corporation in making up the ink composition which it uses in printing the transfers represented as being removable by washing in water, which is alleged by the plaintiff in this suit to infringe the patent in suit, with the exception of the fact that pounds of material are used instead of grams, and that coloring matter is added to the composition, are, as demonstrated by defendants' expert at plaintiff's plant, as follows: 187 grams of No. 8 boiled linseed oil, 227 grams of ordinary yellow beeswax, and 75 grams of carnauba wax, which were placed in a container. The container was then placed upon a gas stove and the wax melted so that the three ingredients could be intimately mixed together. While this mixture was at a temperature of approximately 95° C., 75½ grams of a weak alkali, by name triethanolamine, were added to the molten wax and boiled linseed oil. After the triethanolamine was mixed in with the other ingredients, 17½ grams of caustic soda dissolved in 42½ grams of water were added to the container and mixed in with the other ingredients. There were next added to the mixture 100 grams of ordinary granulated sugar and the mixture was then heated and stirred to drive off the water.

It is true that the specific process of the defendants last described is not found in the prior art, but each of the ingredients of the defendants' composition, waxes, linseed oil, alkali, and sugar, and their characteristics were well known and had theretofore been used in the manufacture of inks long prior to any date of invention that could be claimed for the patent in suit.

While there is no evidence that ink composition, comprising only carnauba wax and beeswax saponified, had ever been tried and used before their use by the defendant Lohmann for the corporate defendant, the plaintiff's expert testified that such a combination of soaps would form a satisfactory ink combination. The treating of wax with an alkali by the corporate defendant corresponds with the well-known method of preparing wax soaps. Linseed oil soap has been well known for many years. The addition of sugar to soap, to render the soap more soluble, has likewise been well known. The use of soaps to render substances emulsifiable which are not miscible in water was also well known, as was also the fact that the washing out qualities of an ink body merely depends upon the amount of soap contained in the ink.

I am unable to find any imitation by the defendants of the plaintiff's process or product.

As hereinbefore stated, each of the claims in suit is limited to a composition containing a specific definite ingredient, a resin acid, and such ingredient is not found in the defendants' product or used in its process, and this excludes the defendants' composition from any charge of infringement.

The patentee in the patent in suit set forth a composition which he found satisfactory and which he said met the requirements mentioned in the specification, but of course did not limit the patent to the details of that method, or to a product which is produced only by that method; but he did say, "The final composition has for its major ingredi-

ents a mixture of resin acid soaps namely, rosin soap and shellac soap."

The question presented is one of equivalents.

Plaintiff's contention, if carried to its logical conclusion, would hold all soaps to be equivalents.

The patent in suit is not a primary patent and no such range of equivalents can be allowed.

Plaintiff contends that in an invented chemical formula or process, to substitute materials having the same properties is a mere substitution of equivalents, even though the substituted materials are not mentioned in the patent, and the chemical formulas of the substituted materials are wholly different from the chemical formulas of the substances mentioned in the patent, and cites Elliott Addressing Mach. Co. v. Wallace Addressing Mach. Co. (D. C.) 39 F.(2d) 233; Haynes Stellite Co. v. Chesterfield Co. (C. C. A.) 25 F.(2d) 719; Johns-Manville Corporation v. National Tank Seal Co. (C. C. A.) 49 F.(2d) 142; Welsbach Light Co. v. Sunlight Incandescent Gas-Lamp Co. (C. C.) 87 F. 221; Welsbach Light Co. v. Rex Incandescent Light Co. (C. C.) 94 F. 1004; Welsbach Light Co. v. American Incandescent Lamp Co. (C. C. A.) 98 F. 613; Universal Gypsum & Lime Co. v. Haggerty (D. C.) 21 F.(2d) 544; Malignani v. Jasper Marsh Consol. Electric Lamp Co. (C. C.) 180 F. 442; A. B. Dick Co. v. Barnett (D. C.) 287 F. 573, affirmed (C. C. A.) 288 F. 799; Polygon Products Corp. v. Kant-Rust-Products Corp. (C. C. A.) 292 F. 569, 572; Chadeloid Chemical Co. v. Frank S. De Ronde Co. (C. C.) 146 F. 988; Chadeloid Chemical Co. v. F. W. Thurston Co. (D. C.) 220 F. 685, 693.

This is undoubtedly the law, but it does not seem to me that the cases cited are in point.

Resin soaps and fatty acid soaps were both old and well known before any date of invention that may be claimed for the patent in suit.

Both a resin acid soap and a fatty acid soap are included in the composition of claims 2 and 3 of the patent in suit, and an intermixture of a fatty acid and a saponified resin are included in the steps of the process of each of the method claims 6, 7, and 8.

Beeswax and carnauba wax are composed of fatty acids and other ingredients, and when those waxes are saponified, you have a soap of a sodium salt of a fatty acid, and a fatty acid soap is always a fatty acid soap.

The saponification of the beeswax and the carnauba wax in the defendants' composition produces a soap of a fatty acid, and does not produce a resin acid soap.

The patentee in his specification distinguishes between a resin soap and what he terms an ordinary soap when he says: "The rosin soap and the shellac soap melt to form a liquid without any decomposition, while an ordinary soap, such as sodium stearate or sodium palmitate does not have this desirable property."

The patentee claims in the same claim a resin acid soap and a soap of a fatty acid. This it seems to me debars him from contending that the two soaps are equivalents.

To allow such a contention would lead to the absurdity of claiming a resin acid soap and its equivalents in the same claim, and if all the soaps claimed by the patentee were equivalents, the claim would be only for the old and well-known resin acid soap, and the claims in suit would be invalid, as an old product would not be patentable by merely assigning to it a new adaptability, and, if allowed, would extend the monopoly beyond the invention. Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868.

In the face of the testimony of the plaintiff's expert, that beeswax and carnauba wax when saponified produce a fatty acid soap, and this is what defendants employ, I cannot accept his opinion that such soap is the equivalent of a resin acid soap, which the defendants do not employ.

There are two well-recognized tests of equivalency, (1) identity of function, (2) substantial identity of way of performing that function (Johns-Manville Corporation v. National Tank Seal Co., supra); and surely if a fatty acid soap, and a resin acid soap, are two of the elements of certain of the claims in suit, one cannot perform the same function as the other, nor in substantially the same way, as that would constitute the two soaps but one element, where the patentee claims two, and would broaden the claims beyond the invention.

The defendants do not infringe.

A decree may be entered in favor of the defendants against the plaintiff, dismissing the bill of complaint with costs.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by the rules of this court.

Settle decree on notice.