G. M. C. PROCESS CORP., Respondent, *v.* JOSEPH GAROFANO et al., Appellants.

First Department, July 3, 1956.

*Frederic L. Weisler* of counsel (*John P. Griffith,* attorney), for appellants.

*Max Shlivek* of counsel (*Saul S. Brin* with him on the brief; *Shlivek & Brin, attorneys*), for respondent.

BERGAN, J. The action is to enjoin the violation of an agreement in pursuance of which a patent was assigned to the plaintiff by defendant Joseph Garofano; and for an accounting. Garofano had invented, and in 1953 had obtained a patent for, a process by which silver is attached as a decoration to plastic materials.

In settlement of earlier litigation between plaintiff and Joseph Garofano an agreement was concluded in writing by which Garofano assigned the patent to the plaintiff and transferred to plaintiff the shares of stock he had in the plaintiff corporation.

He further covenanted that he would not for a period of 15 years " directly or indirectly " engage or become interested in any business " which will use the process covered " by the patent which he was then assigning to plaintiff " in any manner, or on any substance or commodity whatsoever." Defendants Joseph Garofano and Patrick Garofano, sons of Joseph, entered into a similar agreement not to use the process protected by the patent.

The complaint alleges that the process described in the Garofano patent has been used by the defendants in business competition with the plaintiff. After a trial before the court lasting four days, largely devoted to the exposition by two expert witnesses of diverse sides of the technical problem as to whether defendants had or had not utilized the process protected by the patent and in the course of which there were in court physical and other demonstrations of the methods and effects of the process patented and the process used by the defendants, the court found that the agreement had been violated; granted an injunction; and directed that an accounting be had before a referee.

There were some differences shown between the process patented and the process employed by the defendants in decorating plastics with silver. The controlling issue in the case is not whether there were differences capable of enumeration and segregated description; but rather whether the process used by the defendants was essentially the process of the patent. Some differences between any given conflicting processes might reasonably be treated as vital; even though there might remain

some similarities in the way the thing be done; other differences between other processes might reasonably be treated as peripheral in the face of a vital similarity. To say this is to say that the resolution of the issue, technical though it may be, is to be reached in an informed judgment of the facts by the usual and common resources of mind and experience of the judge who hears the witnesses and evaluates what he has heard.

The main problem which the inventor of this patented process tried to solve was to obtain a method by which silver could be attached firmly to plastic material as a base for ornamental and other functions which could be done easily and rapidly enough to be commercially feasible. It seems reasonable to conclude, although this is somewhat of an oversimplification, that the basic procedure was to spray silver in finely powdered particles suspended in a solution of acetone. Acetone is described as a chemical which will attack plastic; the plastic on contact with the acetone and the silver together, is momentarily softened by the chemical, which then evaporates quickly, while the silver remains in firm adherence to the plastic. There is no doubt on the basis of this record that the patent discloses this part of the process and that the defendants use it.

The rest of the problem was to get the silver to adhere permanently to the plastic surface in some places and be easily removable in others; to stay, for example, in the outline of a flower, but be removed from the background. The process disclosed by the patent in this respect is that the design is placed on a silk screen, and a substance consisting of paint, resin, wax and essential oils is forced through the screen on to tissue paper which has been placed under the screen. The result of this procedure is that the waxy, oily substance passing through the screen coats the surface of the tissue paper except at places where the design had covered the screen and prevented attachment of the substance to the paper.

The tissue paper is then something like a photographic " negative ". The waxy, oily substance has attached everywhere except in the outline of the design. The paper, also called a " mask " is then pressed to the surface of the plastic to be treated. The waxy, oily substance adheres to the plastic surface. An immersion in warm water makes it possible to remove the paper mask easily from the plastic. The negative design remains on the exposed areas of the plastic surface, and the waxy, oily substance attaches elsewhere to the surface.

When the powdered silver in acetone solution is thereafter sprayed on the plastic, the acetone acts only on the parts of the

surface not protected by the substances left by the paper mask, i.e., the design; but the acetone does not penetrate to the plastic surface which lies under the areas covered by the substance. The plastic object is then placed in a neutral solvent which has the property of loosening the waxy, oily substance underneath the silver, and with it the silver over the substance, but which solvent does not affect at all the silver which has directly adhered to the surface of the plastic in the areas of the " negative ".

The result is that the silver easily washes in the solvent from the entire area of the plastic surface except where the design appears. There are some other steps involved, such as the building up of the thickness of the metal on the surface by electroplating, which could not, of course, be employed until some metal had adhered to the plastic surface as a base for further deposits. There are other variations in procedures disclosed by the patent indicated for certain differences in the types of plastics used; but this description is enough for our purposes.

The process employed by the defendants applies the silver to the surface of the plastic by spraying it in powdered form suspended in a solution of acetone; but this is done before the design is applied. The " mask " or paper which carries the design is quite similar to that disclosed by the patent. The silk screen process is used for preparing the mask and a similar type of substance is used on the paper mask, consisting of resin, wax and essential oils.

But instead of the application of this substance to the paper mask as a " negative ", it is applied in the positive form of the design itself. The paper mask is then pressed to the plastic object previously coated with the sprayed silver. The mask is removed by means similar to that employed in the patented process. The waxy, oily substance, in the form of the desired design remains on the surface of the silver.

The plastic object is then dipped in nitric acid for about half a second. The acid takes off the silver in the places not covered by the substance deposited by the mask. The result is that the design in silver remains on the surface. Electroplating is then used to build up the silver on the design to the desired thickness. This is a generalized description of the process used by the defendants as we understand it.

Expert witnesses testified to diverse opinions relating to the essential similarity or dissimilarity of the two processes. Very heavy reliance is placed by the defendants in their brief and in

their argument advanced before this court, on the contention that the removal of the unwanted silver after the design had been outlined, according to their process, is in reality an " etching " by the nitric acid, and hence radically different from that disclosed by the patent.

An expert called by the plaintiff found " 12 points of similarity and 3 points of differences " between the two processes. He testified to an opinion that not only the " end result " of the two processes is the same, but that " I also note that many of the steps are identical, and many of the principles by which these steps are carried out are identical."

To a question asked by defendants' counsel on cross-examination as to whether the witness considered as equivalents the application of the substance from the mask to the surface of the silver coating by the defendant's process and its application to the direct surface of the plastic in the patented process, the witness said: " Yes; I consider those equivalent." Pressed further on cross-examination he said that " My belief as to why this patent that we are discussing was granted is that it used many procedures well known in the art and combined them in such a way that a new and novel end result was obtained. * * * if Mr. Garofano applied for a patent on his new process, this present patent would be cited as prior art, and his new application would be refused."

On the method used by the defendants in the removal of the unwanted silver, on which defendants place so heavy a reliance to distinguish the processes, on cross-examination the witness said: " I do not state that acid etching is the same as solvent means of removal of the silver. I do state that there are many ideas incorporated in the patented process which have been adopted by the new process to achieve the very same end result."

The summary of his direct testimony was that the defendants use the process covered by the patent, and that " It is my opinion that the reasons for the changes in the process which Mr. Garofano has adopted were made in an attempt to avoid the exact process described in the patent * * *. to avoid infringement."

An expert called by the defendants testified that in his opinion the process disclosed by the patent and that employed by the defendants were essentially and radically different; and he expressed the view that the process used by defendants is much closer in application to that disclosed by another patent (the McFarland patent) than it is to the patent here in question.

In relation to the method of removing unwanted silver there are "markedly different functions." The etching of the unwanted metal by acid, he noted, "is the old and common practice of doing that."

The use of acid "resist" material (by which defendants prevent the nitric acid from removing the silver from the design outline) he said "in connection with etching is very common and very old." This being what the defendants use, he noted that the patented process differed radically because "here we have a combination where a certain result is achieved and acid etching is eliminated." He continued: "And where the patent uses a neutral solvent for the acid resist, it carries away silver with it, so that there are no corresponding functions at all. Certainly the etching action of the nitric acid does not correspond in any way as to function with the purely mechanical solvent action of a solvent".

We look to the patent infringement suits for our general guidance in this kind of an action. It will be noted at once that in areas of technical controversy over mechanics, or chemical or other processes, illumined by the demonstrations of the expert witness in the courtroom where conflicting views of specialists have been evaluated by the trial judge, there is something more than the usual tendency to accept the factual findings by which the controversy has been resolved.

Mr. Justice JACKSON noted in *Graver Mfg. Co.* v. *Linde Co.* (336 U. S. 271, 274), in reference to that part of subdivision (a) of rule 52 of the Rules of Civil Procedure for the District Courts of the United States requiring that due regard be given to the opportunity of the trial court to judge credibility, as to a patent infringement suit, that "To no type of case is this last clause more appropriately applicable than to the one before us, where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations."

There is a marked judicial policy to read the language of a patent more liberally when the assignee of the patent maintains the suit for infringement against the assignor than when the controversy arises between strangers. The court in *Hurwood Mfg. Co.* v. *Wood* (138 F. 835, 836) dealing with the infringement of a patent for a screw driver rejected the argument that plaintiff was confined "to the exact construction set forth in the Wood patent" with the comment that if the court were to apply an exact construction "there is no infringement"; but held that under the doctrine of estoppel "plaintiff is entitled to a liberal construction of his patent, as against this defendant". This

principle finds reflection in many cases in the Federal jurisdiction. *Frick Co.* v. *Lindsay* (27 F. 2d 59, 61) is one; *St. Joseph Iron Works* v. *Farmers Mfg. Co.* (106 F. 2d, 294, 298) and *Smith* v. *Ridgely* (103 F. 875) are others.

The opinion by WOODS, J. in *Leader Plow Co.* v. *Bridgewater Plow Co.* (237 F. 376) is an expression in a significant case of the prevailing view on the subject. He noted that while patents which are mere improvements on a prior art are generally given a narrow construction, the rule is different as between assignor and assignee, even as to such a patent. He applied the dominant equitable rule between assignor and assignee that the patent must be liberally construed " to give full value to the patent assigned, and shut out the assignor from every structure within the fair meaning of the claim " (p. 377). (See, also, *Piano Motors Corp.* v. *Motor Player Corp.*, 282 F. 435.)

There are other canons which seem to us to have relevancy to the controversy before us. One is that a mere reversal of the order of the process protected by the patent does not avoid actionable infringement. For example in the *Piano Motors Corp.* case which has just been cited, it was held that the transposition of the location of a motor used in a player piano invention did not avoid the infringement, even though there was claim by the defendant that the different position, in which the same function was performed as that covered by the patent, had other benefits in cooling the operation of the process worked by the motor.

A transposition in the process is similarly regarded. This is suggested in the litigation over the manner in which a vacuum was created in the early incandescent lamp (*Malignani* v. *Germania Elec. Lamp Co.*, 169 F. 299, 301). The court noted: " There is, moreover, uncontradicted expert testimony to the effect that both of its processes are substantially like the process of the patent, since they are the same in principle, mode of operation, and result. * * * Transposition of the various steps is, under such circumstances, mere evasion."

The wax paper decision (*Hammerschlag Mfg. Co.* v. *Bancroft*, 32 F. 585, 589) is of some more direct aid on this point in assessing the case now before us; because there the process followed by the defendant in impregnating paper with paraffin differed somewhat from the patented process in the way the paper was handled by the machine, but " heat, pressure and friction " outlined in the patent were used in both, and the court was of opinion that the difference in the methods was essentially a difference in the order in which the process was carried out.

An added ingredient to the process may sometimes not sufficiently change the fundamental idea of the patent to avoid conflict. This is demonstrated in *Beyer Co.* v. *Fleischmann Co.* (15 F. 2d 465, 467) which involved a patented formula for making bread; and while a chemical element was added to the process which defendants argued served a different and new function in affecting the time in which the dough was to be baked, the court on the whole record regarded the purpose of the added element as designed to permit defendants "to practice, if possible without infringement, the process shown by plaintiff's patents." (See, also, *Chadeloid Chem. Co.* v. *Thurston Co.*, 220 F. 685.)

No clearer statement of the fundamental basis of approach in patent infringement litigation has been written than the words in juxtaposition of Mr. Justice STRONG in railroad car wheel case decided by the court in *Mowry* v. *Whitney* (14 Wall. [81 U. S.] 620, 648). Infringement occurred, he said, when the processes are "only formally different" while the "essential element" is the same.

In this controverted issue before us, we are of opinion that the record sufficiently supports the view of the Trial Justice that the defendants have breached their contract not to engage in a business use of the patent which Joseph Garofano assigned plaintiff "in any manner * * * whatsoever".

We hold that there is a sufficient relationship disclosed by expert opinion, and intrinsically, between the two processes in method and result to justify a decision that the process used by defendants comes within the restrictive terms of the contract.

The injunctive provisions of the judgment, however, sweep out along broader lines than to prohibit merely the use of the process disclosed by the patent. The judgment prevents defendants "From stating or advertising * * * that they are engaged in the same or similar business to that of the plaintiff for ornamenting articles made of plastics." This goes beyond the negative undertaking of the defendants by their contract.

Defendants ought not be restrained from using any method to decorate plastics with metal; they should be restrained from using the method they have been employing or a modification thereof which will reasonably be seen to infringe on the patent which Garofano has assigned to plaintiff.

The judgment should be modified by affirming so much thereof as directs an accounting and by recasting the injunctive provisions in accordance with this opinion and as thus modified it should be affirmed, with costs to plaintiff. Settle order on notice.

PECK, P. J., BREITEL, FRANK and VALENTE, JJ., concur.

Judgment unanimously modified by affirming so much thereof as directs an accounting and by recasting the injunctive provisions in accordance with the opinion herein and, as so modified, affirmed, with costs to the plaintiff. Settle order on notice.